Filed 10/28/20; Modified and Certified for Publication 11/25/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SORAYA SABETIAN, | B297107 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC475956) |
| v. | |
| EXXON MOBIL CORPORATION et al., | |
| Defendants and Respondents. | |

APPEAL from the judgment of the Superior Court of Los Angeles County, John J. Kralik, Judge.  Affirmed.

Weitz & Luxenberg, Benno Ashrafi and Josiah Parker for Plaintiff and Appellant.

Dentons US, Jayme C. Long, Justin Reade Sarno, Alexander B. Giraldo; Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Joshua S. Lipshutz and Joseph R. Rose for Defendants and Respondents Exxon Mobil Corporation and ExxonMobil Oil Corporation.

King & Spadling, Ashley C. Parrish, Peter A. Strotz, Steven D. Park and Anne M. Voigts for Defendants and Respondents Chevron U.S.A. Inc. and Texaco, Inc.

——————————————

Soraya Sabetian[1] appeals from a judgment entered after the trial court granted the motions for summary judgment filed by defendants Chevron U.S.A. Inc. and Texaco, Inc. (Chevron defendants), and Exxon Mobil Corporation and ExxonMobil Oil Corporation (Exxon defendants). Soraya and her husband Houshang Sabetian brought claims for negligence, premises liability, and loss of consortium, alleging Sabetian contracted mesothelioma caused by exposure to asbestos while he was an Iranian citizen working for the National Iranian Oil Company (NIOC) from about 1960 to 1979 in facilities controlled by defendants.[2] The trial court concluded the Chevron and Exxon defendants did not owe a duty of care to Sabetian.

On appeal Soraya contends the Chevron and Exxon defendants owed Sabetian a duty of care based on their predecessors' control over the Abadan refinery in which Sabetian

———————————

[1] During the pendency of this appeal, Houshang Sabetian died. On July 29, 2020 we granted Soraya Sabetian's motion to be substituted in place of Houshang Sabetian as his successor in interest. To avoid confusion, we refer to Houshang Sabetian as Sabetian and Soraya by her first name.

[2] Mesothelioma is a cancer associated with exposure to asbestos. The parties dispute the extent to which asbestos exposure causes testicular mesothelioma, with which Sabetian was diagnosed.

2

worked and a 1954 contractual agreement between the Iranian government and a consortium of international oil companies, including defendants' predecessors in interest (the Agreement). Soraya also asserts the Chevron and Exxon defendants, through their predecessors, owed a duty to protect refinery workers like Sabetian from asbestos exposure based on a special relationship between the predecessors and the refinery workers arising from commitments in the Agreement.[3] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Agreement*[4]

In 1951 the government of Iran nationalized its oil assets, assuming control from the Anglo-Iranian Oil Company, which was majority-owned by the government of Great Britain. In 1952 Iran formed NIOC to own and supervise all of Iran's oil assets. But NIOC did not have access to the global oil markets. To avoid possible influence from the former Union of Soviet Socialist Republics, the United States "devised a plan in which a consortium of newly-formed international corporations would operate the Abadan refinery and some of the other Iranian Oil

---

[3]    Soraya also contended in her appellate briefing that Sabetian was a third party beneficiary of the Agreement. However, at oral argument Soraya's attorney stated Soraya is no longer relying on this argument.

[4]    This discussion is based on undisputed facts taken from evidence submitted in connection with the summary judgment motions.

Premises, under Iranian supervision."[5]  The United States invited several major American companies with operations in the Middle East to participate in an international consortium with other oil companies.

In 1954 American oil companies Gulf Oil Corporation, Socony-Vacuum Oil Company, Inc., Standard Oil Company of New Jersey, Standard Oil Company of California, and the Texas Company, and European oil companies Anglo-Iranian Oil Company, Ltd., N.V. de Bataafsche Petroleum Maatschappij, and Compagnie Francaise des Pétroles (collectively, the consortium members) entered into the Agreement with Iran and NIOC. Defendant Chevron is the successor in interest to Standard Oil Company of California and Gulf Oil Corporation.  Defendant Texaco, Inc., is the successor of the Texas Company.  The Exxon defendants are successors in interest to Socony-Vacuum Oil Company, Inc., and Standard Oil Company of New Jersey.

The Agreement consists of two parts, the first among the consortium members, Iran, and NIOC and the second among Iran, NIOC, and the Anglo-Iranian Oil Company, Ltd.  Only part I is at issue in this case.  The recitals for part I provided, "WHEREAS, both the Government of Iran and [NIOC] desire to increase the production and sale of Iranian oil, and thereby to increase the benefits flowing to the Iranian nation . . . , but additional capital, experienced management, and technical skills are required in order to produce, refine, transport and market . . . oil in quantities sufficient to effect this increase in a substantial

---

[5]     It is undisputed the Agreement principally covered the Abadan refinery.  Consistent with the practice of the parties, we use "Abadan refinery" to refer generally to the area covered by the Agreement.

4

amount . . . [¶] WHEREAS, the international oil [consortium members] are in a position and are willing to supply such capital, management and skills; and [¶] . . . are in a position to market substantial quantities of Iranian oil . . . throughout a large part of the world over a considerable period of time, to the mutual benefit of the Iranian nation and themselves . . . [¶] . . . the Parties are agreed that said companies should undertake the operation and management of certain of the oil properties . . . of the Government of Iran and [NIOC], including the Abadan refinery, as hereinafter set forth . . . [¶] . . . negotiations have been amicably carried out with the object of assuring to the Government of Iran and [NIOC], on the one hand, a substantial export market for Iranian oil and a means of increasing the material benefits to and prosperity of the Iranian people, and to the companies, on the other hand, the degree of security and the prospect of reasonable rewards necessary to justify the commitment of their resources and facilities to the reactivation of the Iranian oil industry."

Article 3, section A of the Agreement provided that to carry out the "functions of exploration, producing, refining, transportation and the other functions specified in" the Agreement, the consortium members incorporated the "Operating Companies" under the laws of the Netherlands. The Agreement defined the Operating Companies as the Iranian Oil Exploration and Producing Company (IOEPC) and Iranian Oil Refining Company (IORC). The consortium members incorporated a holding company, Iranian Oil Participants Ltd. (IOP), which wholly owned IOEPC and IORC. Each consortium member formed at least one wholly owned subsidiary, each of which purchased 7 to 8 percent of IOP's shares. In article 3, section A of

5

the Agreement, the consortium members "jointly and severally guarantee[d] the due performance by the Operating Companies of their respective obligations under this Agreement."

Article 4 of the Agreement listed and "strictly limited" the "rights, powers and obligations of the Operating Companies as well as the nature and extent of the supervision to be exercised by Iran and NIOC . . . to what is clearly stated in this Article." (Art. 4, § J.) Section A, paragraph (1) provided IOEPC the right to explore, drill for, produce, extract, process, store, transport, and ship crude oil and natural gas. Section A, paragraph (2) provided for IORC to have the right to refine and process crude oil and natural gas produced by IOEPC.

Article 4, section F sets forth "[t]he obligations of the Operating Companies to Iran and NIOC." These obligations included the duty "to conform with good oil industry practice and sound engineering principles applicable and appropriate to operations under similar conditions in conserving the deposits of hydrocarbons, in operating the oilfields and refinery and in conducting development operations." (Agreement, art. 4, § F, ¶ (1).) The Operating Companies were obligated "to carry on such exploration operations as are economically justifiable with a view to providing sufficient reserves to support the rate of production of oil" (*id.*, § F, ¶ (2)); to maintain full records and accounts of their activities (*id.*, § F, ¶ (3)); "to minimize the employment of foreign personnel" (*id.*, § F, ¶ (4)); and "to prepare in consultation with NIOC plans and programs for industrial and technical training and education and to cooperate in their execution . . . to replace foreign personnel as soon as reasonably practicable" (*id.*, § F, ¶ (5)). Article 4, section I further provided, "[T]he Operating Companies shall determine and have full and

6

effective management and control of all their operations," subject to supervision of their operations by Iran and NIOC as set forth in sections F and G.

Article 5, section A of the Agreement stated, "Iran and NIOC undertake that neither of them, and no person other than the Operating Companies, shall at any time . . . carry out . . . any of the functions specified in [p]aragaphs (1) and (2) of Section A of Article 4 of this Agreement" (defining the rights of IOEPC and IORC to exploration, production, and refining). Article 7 of the Agreement granted the Operating Companies the right to "exclusive use" of certain lands owned by NIOC and Iran for "their operations under [the] Agreement."[6] Under article 17 of the Agreement, NIOC retained authority over all "non-basic operations," including medical and health services, industrial and technical training and education, and housing.

Article 18 provided consortium members "shall" purchase crude oil and "may" purchase natural gas from NIOC for resale in Iran for export. Consortium members were permitted to assign their rights and obligations to purchase crude oil and natural gas to their subsidiaries, referred to "Trading Companies." Under article 20 of the Agreement, the consortium members guaranteed certain oil production and export quantities on an annual basis.

The Agreement contemplated a 25-year lifespan, but in 1973 Iran assumed operations from IORC and IOEPC. IORC's employees were transferred to a new entity formed by NIOC, Oil

---

[6] It is undisputed NIOC owned and operated the Abadan refinery prior to execution of the Agreement, and the Agreement's grant of authority to the Operating Companies constituted a transfer of control over the functions in article 4 from NIOC to the Operating Companies.

Services Company of Iran, which assumed operation of the Abadan refinery.

B.    *The Complaint*

Sabetian and Soraya filed this action on March 28, 2018 against the Chevron and Exxon defendants and others, alleging causes of action for negligence, strict liability, premises liability, negligent joint venture, alter ego, and loss of consortium.  The complaint alleged the Chevron and Exxon defendants are the successors in interest to consortium members that were signatories to the Agreement.  The complaint alleged further Sabetian was exposed to products containing asbestos while he worked at the Abadan refinery and other Iranian facilities from approximately the 1960's to the late 1970's.  In January 2017 Sabetian was diagnosed with testicular mesothelioma caused by his exposure to asbestos at these facilities.  The complaint alleged the predecessors to the Chevron and Exxon defendants, as consortium members, contributed "capital, management and skills in the operation and management of the oil properties of the [NIOC], specifically the . . . oil refinery in Abadan, Iran."  Further, the predecessor companies had "full and effective control of the [Abadan] refinery . . . in order to operate that refinery in conformity with good oil industry practice and sound engineering principles applicable to that industry."

C.    *The Chevron and Exxon Defendants' Motions for Summary Judgment*

The Chevron and Exxon defendants separately moved for summary judgment.[7]  They argued they owed no duty of care to Sabetian because they did not own, possess, or control the facilities in which Sabetian alleged he was exposed to asbestos.

The Chevron defendants filed a declaration of Frank G. Soler, the senior subsidiary governance liaison for Chevron Corporation, who stated the Chevron defendants' predecessors "did not ever own, lease, maintain, manage, control, or supervise" the Abadan refinery.  Soler averred a separate corporate entity facilitated requests from the Operating Companies to the consortium members "for skilled personnel."  Employees of the consortium members sent to work at the Abadan refinery were "seconded," meaning "their employment with the [consortium member] oil company terminated and such employees were then formally employed by IORC and/or IOEP[C.]"

The Chevron defendants also filed a declaration of former Texaco, Inc., employee Carter Conlin, in which Conlin averred he worked at the Abadan refinery from 1958 to 1963.  At the refinery, Conlin supervised[8] approximately 20 engineers, including "seconded employees" from other oil companies.  Conlin and the other seconded employees he supervised were "employed

---

7    The Sabetians also moved for summary judgment of their claims, which the trial court denied.

8    From 1958 to 1960, Conlin held the position of section head of the oil conversion processes section of the process engineering department for IORC.  From 1960 to 1963, he held the position of technical advisor for catalytic reforming in the refining operations department for IORC.

9

and paid by IORC for all work performed at the Abadan [r]efinery." Conlin and the employees Conlin supervised did not take direction or payment from "their previous oil company employer or any oil company subsidiaries." The Chevron defendants filed excerpts from deposition testimony from Conlin in *Alkhas v. A.W. Chesterton Company* (Super. Ct. L.A. County, 2014, No. BC473745), in which he testified employees loaned by consortium members to IORC were thereafter treated as employees of IORC.[9]

D. *The Sabetians' Oppositions to Defendants' Motions for Summary Judgment*

The Sabetians opposed the Chevron and Exxon defendants' motions, arguing the Agreement and defendants' control over operations at the Abadan refinery created a duty of care owed by the Chevron and Exxon defendants to Sabetian to protect him from asbestos exposure.[10] The Sabetians filed multiple

---

[9] The Exxon defendants also relied on the Conlin and Soler declarations and the Conlin deposition transcript filed by the Chevron defendants.

[10] The Sabetians abandoned their strict liability, negligent joint venture, and alter ego claims during the summary judgment proceedings by failing to oppose summary adjudication of those claims. The Sabetians did not dispute they had "no information about how" IOP, IORC, IOEPC, or NIOC "were capitalized, whether they held shareholder meetings, or whether they held board of director meetings," "no evidence to support a finding that IOP, IORC, IOEP[C], [or] the [consortium members] . . . had a right of joint control and ownership of the Abadan [r]efinery," and "no evidence to support piercing the corporate veils" of IOP, IORC, IOEPC, NIOC, or the consortium members.

10

declarations and excerpts of deposition testimony with their oppositions.

Dr. Neill Weaver stated in his deposition testimony he worked from 1951 to 1973 as a physician for Esso Standard Oil Company, an Exxon predecessor.[11] When asked about Esso's asbestos practices, Dr. Weaver testified that when he began working in Esso's Baton Rouge, Louisiana refinery in 1951, "measures were in effect for the control of exposures throughout the refinery and the medical surveillance program for the workers potentially exposed to asbestos was in operation and had been in operation for decades." Dr. Weaver identified a 1937 document entitled "Dust Producing Operations in the Production of Petroleum Products and Associated Activities," which made suggestions for control and suppression of asbestos dust. The Sabetians also attached Exxon Mobil Corporation's responses to interrogatories, in which it admitted it began warning its employees of the dangers of asbestos dust as early as 1936.

Bruce Larson, who testified as Exxon Mobil Corporation's person most qualified in *Shahabi v. A.W. Chesterton Company* (Super. Ct. L.A. County, 2012, No. BC421531), was asked, "Do you agree that Exxon and Mobil had employees in high level management at the Abadan refinery between 1955 and 1968?" He responded, "I think that's probably correct, yes." Larson also testified it was "certainly possible" that a person with management responsibility could cause work practices to be

---

[11] Weaver testified he worked for Esso Standard Oil Co., which later became Exxon. The Exxon defendants acknowledge previously doing business under the name Esso. It is not clear from the record which consortium member Esso succeeded.

11

followed at the refinery, but he clarified that the Abadan refinery "had a patchwork of various jobs represented by Iranian nationals, various jobs represented by people from the participating oil companies, and . . . I don't really know how control was exercised in a situation like that." Larson testified he believed Exxon employees who worked at the Abadan refinery would be paid by the "holding company," not Exxon, and he was not aware of Exxon or Mobil "exercis[ing] any direct control over anybody" working at the Abadan refinery.

Testifying as Exxon Mobil Corporation's person most qualified in *Enayati v. A.W. Chesterton Company* (Super. Ct. L.A. County, 2009, No. BC400729), Larson testified he had no direct knowledge of the health and safety practices of the Abadan refinery during the period from 1954 to the 1980's. But he stated it had "always been at least the policy of Exxon and Mobil that . . . the same rules and regulations that apply domestically apply to overseas facilities. So I'm assuming that—and this is an assumption . . . [¶] . . . that comparable safety procedures and programs would be in place at [the Abadan] refinery as they would have been elsewhere." Larson affirmed he based his assumption on his experience with the standard operating procedures of the company.

Daniel Agopsowicz testified in his deposition as the person most qualified for the Exxon defendants. When asked whether the Exxon defendants agreed "[i]t is part of good oil industry practice to ensure that the people on the refinery floor are kept safe," Agopsowicz replied, "Yes." When asked whether the Exxon defendants' predecessors "believe[d] at the time of signing [the Agreement] that [they] had an obligation to ensure that the Abadan [r]efinery was operated appropriately," Agopsowicz

12

replied, "If they signed [the Agreement], then they would agree with this, yes."[12]

In response to the Exxon and Chevron defendants' undisputed material facts, the Sabetians did not dispute that Sabetian was employed by NIOC, not by defendants or their predecessors, and he was never supervised or directed by an employee of the defendants or their predecessors. Nor did the Sabetians dispute "IORC was the company that conducted the basic functions necessary for refining oil and natural gas at the Abadan [r]efinery." Likewise, the Sabetians did not dispute that the Chevron defendants did not "select, procure, manufacture, distribute, sell, or install any asbestos-containing products or equipment" at the Iranian facilities. The Sabetians also did not dispute that IOP did not operate any Iranian oil facilities.

E.    *The Trial Court's Ruling and Entry of Judgment*

On November 1, 2018 the trial court granted the Chevron and Exxon defendants' motions for summary judgment. In its written ruling, the court found the parties to the Agreement "did not intend to provide Iranian oil refinery workers with a direct remedy against the American oil companies sued here." The court rejected Sabetian's argument refinery workers were third party beneficiaries to the Agreement, reasoning it was "far-fetched to believe that the parties to the . . . Agreement thought of the refinery workers at all, except to find a way to limit their liability to the American companies that were being enlisted to

---

[12]    It appears from the question and answer that this testimony was in the context of questions about the Agreement. However, the record does not contain the prior page of the deposition transcript.

invest." The court explained, "There is no other reason for the complicated structure making clear that the Oil Companies were shareholders, and not directly responsible for the ownership and operation of the refineries. It is hard to imagine why the parties would have made such an effort to limit the liability of the new investors through complicated corporate structures if their real intent was to be directly liable to Iranian refinery workers and other creditors of the operating entities. In sum, there is nothing in the Agreement or the contemporary writings that indicates an intent to benefit third parties at all."

The court also rejected the Sabetians' argument the recitals in Part 1 of the Agreement created rights and obligations of the Chevron and Exxon defendants. Further, the court found the Agreement was "clear that the 'Operating Companies' are separate entities from the [d]efendants. The corporate forms should be respected given [the Sabetians'] decision to not submit evidence regarding the joint-venture and alter-ego claims." The court continued, "While the Oil Companies' predecessors did guarantee the obligations of the Operating Companies under the Agreement, there is no evidence that the parties intended that third parties would have the option of enforcing these guarantees."[13]

Finally, the court found the other evidence submitted by the Sabetians did not support their position because "[n]one of it [was] contemporaneous with the execution of the Agreement, or [was] informative of the underlying intent of the Agreement."

_____

[13] In ruling on the motions for summary judgment, the trial court overruled all evidentiary objections made by the parties. The parties do not renew their objections on appeal, and we do not consider them.

14

Further, the former employees' testimony confirmed IORC operated the Abadan refinery, which employed the workers and ran the "safety department," but the testimony "fail[ed] to establish that the named [d]efendants owned and operated the refineries." The court concluded the predecessor oil companies "who were IOP shareholders did not owe a duty to Mr. Sabetian under the . . . Agreement."

On November 20, 2018 the trial court entered judgments of dismissal in favor of the Chevron and Exxon defendants. The Sabetians timely appealed.

## DISCUSSION

A. *Standard of Review on Summary Judgment*

Summary judgment is appropriate only if there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*); *Delgadillo v. Television Center, Inc.* (2018) 20 Cal.App.5th 1078, 1085.) "''''We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.'" [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.'''" (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; accord, *Valdez v. Seidner-Miller, Inc.* (2019) 33 Cal.App.5th 600, 607 (*Valdez*).)

A defendant moving for summary judgment has the initial burden of presenting evidence that a cause of action lacks merit

15

because the plaintiff cannot establish an element of the cause of action or there is a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853; *Valdez, supra*, 33 Cal.App.5th at p. 607.) If the defendant satisfies this initial burden, the burden shifts to the plaintiff to present evidence demonstrating there is a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850; *Valdez*, at p. 607.) We must liberally construe the opposing party's evidence and resolve any doubts about the evidence in favor of that party. (*Regents, supra*, 4 Cal.5th at p. 618; *Valdez*, at p. 608.)

B.      *Principles of Contract Interpretation*

"'The rules governing the role of the court in interpreting a written instrument are well established. The interpretation of a contract is a judicial function. [Citation.] In engaging in this function, the trial court "give[s] effect to the mutual intention of the parties as it existed" at the time the contract was executed. [Citation.] Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms. [Citations.]'" (*Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 432; accord, *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195; *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125-1126.) "'Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous. [Citations.]'" (*Brown*, at p. 432; accord, *Wolf*, at p. 1126.)

"The law has long distinguished between a 'covenant' which creates legal rights and obligations, and a 'mere recital' which a party inserts for his or her own reasons into a contractual

16

instrument.  Recitals are given limited effect even as between the parties." (*Emeryville Redevelopment Agency v. Harcros Pigments, Inc.* (2002) 101 Cal.App.4th 1083, 1101; accord, *Hunt v. United Bank & Trust Co.* (1930) 210 Cal.108, 115 ["Recitals or preambles prefixed to an agreement may or may not have binding force.  If they form part of the operative covenants of the instrument in such a way as to show it was designed and intended that they should form part of it, they will be so construed."]; *O'Sullivan v. Griffith* (1908) 153 Cal. 502, 506 ["A covenant or warranty is never implied from a mere recital."]; *McDonough v. Chu Chew Shong* (1937) 21 Cal.App.2d 257, 259 [contract to indemnify bail bondsmen was enforceable because the argued variance between the bond's guarantee and the respondent's criminal offense was in "a mere recital and form[ed] no part of the contractual obligation"].)  However, "[i]f the operative words of a grant are doubtful, recourse may be had to its recitals to assist the construction." (Civ. Code, § 1068;[14] see *Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 38 [language labeled "recital" was actually covenant because it contained operative promise and recourse to language was necessary to identify real property subject to the agreement].)

C.    *The Sabetians Failed To Raise a Triable Issue of Fact as to Their Negligence and Premises Liability Claims*
    1.    *Duty of care*
    "The elements of a negligence claim and a premises liability claim are the same:  a legal duty of care, breach of that duty, and

---

[14]    All further undesignated statutory references are to the Civil Code.

proximate cause resulting in injury." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1158 (*Kesner*); accord, *Castellon v. U.S. Bancorp* (2013) 220 Cal.App.4th 994, 998.) "Recovery in a negligence action depends as a threshold matter on whether the defendant had "'a duty to use due care toward an interest of [the plaintiff's] that enjoys legal protection against unintentional invasion.'"" (*Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 397.)

"In general, each person has a duty to act with reasonable care under the circumstances." (*Regents, supra*, 4 Cal.5th at p. 619; accord, *Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1083 (*Vasilenko*).) As section 1714 provides, "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself." "'[I]n the absence of a statutory provision establishing an exception to the general rule of . . . section 1714, courts should create one only where "clearly supported by public policy."'" (*Kesner, supra*, 1 Cal.5th at p. 1143; accord, *Regents, supra*, 4 Cal.5th at p. 628 ["The court may depart from the general rule of duty . . . if other policy considerations clearly require an exception."]; *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771 (*Cabral*).)

In determining whether an exception to section 1714 applies, courts consider "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the

18

extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland v. Christian* (1968) 69 Cal.2d 108, 113 (*Rowland*); accord, *Kesner, supra*, 1 Cal.5th at p. 1143.)

A defendant's control over property is sufficient to create a duty of care owed to persons using the property. (*Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1162, 1166 [affirming reversal of summary judgment because there were triable issues of fact as to landlord's control of strip of city land where landlord had "maintained the lawn . . . and, subsequent to the incident at issue, constructed a fence surrounding the entire lawn"]; *Annocki v. Peterson Enterprises, LLC* (2014) 232 Cal.App.4th 32, 37 [trial court should have allowed plaintiff to plead that defendant restaurant failed to warn patrons leaving the restaurant that only a right turn could safely be made from its parking lot although accident occurred on adjacent roadway].)

"Premises liability "'is grounded in the possession of the premises and the attendant right to control and manage the premises'"; accordingly, "'mere possession with its attendant right to control conditions on the premises is a sufficient basis for the imposition of an affirmative duty to act.'"" (*Kesner, supra*, 1 Cal.5th at p. 1158; accord, *Taylor v. Trimble* (2017) 13 Cal.App.5th 934, 943-944 ["landowners are required 'to maintain land in their possession and control in a reasonably safe condition' [citations], and to use due care to eliminate dangerous conditions on their property"].) However, "[a] defendant cannot be held liable for the defective or dangerous condition of property which it did not own, possess, or control. Where the absence of

19

ownership, possession, or control has been unequivocally established, summary judgment is proper." (*Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 134; accord, *Seaber v. Hotel Del Coronado* (1991) 1 Cal.App.4th 481 [hotel did not owe duty to patron who was struck and killed in a marked crosswalk outside hotel's entrance]; cf. *Vasilenko, supra*, 3 Cal.5th at p. 1085 [church had duty toward invitees who crossed public street to get to parking lot across the street because the church increased the invitees' exposure to the dangers of the street by placing and maintaining the parking lot on the other side of the street].)

"[S]ection 1714 does not . . . impose a presumptive duty of care to guard against any conceivable harm that a negligent act might cause." (*Southern California Gas Leak Cases, supra*, 7 Cal.5th at p. 399; accord, *Dekens v. Underwriters Laboratories Inc.* (2003) 107 Cal.App.4th 1177, 1187-1188 [plaintiffs failed to raise a triable issue of material fact whether defendant "undertook the responsibility to guarantee [decedent's] safety from cancer-causing asbestos through its process of testing and certifying small appliances as safe from injury due to fire, electrical shock, or injuries from sharp protruding objects"].)

2. *The Sabetians failed to raise a triable issue of fact as to the Chevron and Exxon defendants' ownership, possession, or control of the Iranian facilities*

Soraya acknowledges the central question is whether the Chevron and Exxon defendants (as successors to the consortium members) "had active supervisory control and management over the premises." Soraya contends the consortium members controlled asbestos sources at the Iranian facilities at which

20

Sabetian was exposed to asbestos. She argues the Agreement itself created a duty of care by providing for the consortium members to undertake to create the Operating Companies, ensure the Operating Companies would use "good oil industry practice," promise to purchase oil for export, and guarantee the production and exportation of specified quantities of oil.

But the Chevron and Exxon defendants' commitments in the Agreement do not demonstrate their control over the Abadan refinery. Soraya does not dispute NIOC, and later Iran, not the consortium members, owned the facilities where Sabetian was exposed to asbestos. Article 1 of the Agreement defined "Operating Companies" by express reference only to IOEPC (the exploration and production company) and IORC (the refining company), to the exclusion of the separately defined term of "[c]onsortium members." The Agreement gave Iran and NIOC supervisorial authority over the Operating Companies, with IORC and NIOC sharing control of the Abadan refinery. As discussed, IORC controlled the refining and processing of the crude oil and natural gas at the refinery (art. 4, § A, ¶ (2)) and NIOC controlled the "non-basic operations," including housing, medical and health services, and industrial and technical training and education (art. 17, §§ A, ¶ (1), B). Contrary to Soraya's assertion the Chevron and Exxon defendants' predecessors had effective control over the Abadan refinery, the Agreement expressly stated "no person other than the Operating Companies, shall at any time . . . carry out . . . any of the functions" of exploration, production, and refining, and the "nature and extent of the foregoing rights, powers and obligations of the Operating Companies as well as the nature and extent of

21

the supervision to be exercised by Iran and NIOC shall be strictly limited to what is clearly stated in [article 4]."

That each of the consortium members or their subsidiaries owned 7 to 8 percent of IOP's shares, which in turn owned IOEPC and IORC, is not sufficient to create a duty of care as to refinery workers employed by the Operating Companies, let alone those employed by NIOC, like Sabetian, absent evidence supporting the piercing of the corporate veil based on the alter ego doctrine. (See *Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300 [to pierce the corporate veil, a plaintiff must show "'(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow'"]; *Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 220 ["Ordinarily a corporation is considered a separate legal entity, distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations."].) Further, to the extent the consortium members controlled IOP, which in turn owned the Operating Companies, the Sabetians never presented evidence to support liability of IOP as the parent corporation. (See *Waste Management, Inc. v. Superior Court* (2004) 119 Cal.App.4th 105, 110 ["[A] parent corporation is not liable for injuries of a subsidiary's employee in the absence of evidence establishing a duty owed by the parent corporation to the employee."].) As discussed, the Sabetians abandoned their alter ego claims during the summary judgment proceedings.

Soraya is correct the consortium members incorporated the Operating Companies and "jointly and severally guarantee[d] the due performance by the Operating Companies of their respective

22

obligations under this Agreement."  (Art. 3, § A.)  Further, under the Agreement, "[t]he obligations of the Operating Companies to Iran and NIOC" included a commitment "to conform with good oil industry practice."[15]  (Art. 4, § F, ¶ (1).)  In addition, under article 20 of the Agreement, the consortium members guaranteed the Abadan refinery would produce and export certain quantities of oil.  Although Soraya argues these commitments show the consortium members had some ability to intervene in refinery management to meet these goals, the consortium members could have satisfied their commitments, as they argue, by their creation of independent corporate entities (the Operating Companies) to provide the necessary day-to-day management and control of the Abadan refinery.  As stated, the Agreement tasked IORC and NIOC, not the consortium members, with refinery operations.  Further, as discussed below, to the extent the Chevron and Exxon members' duty of care owed to refinery workers flowed from the terms of the Agreement, the Sabetians had to show Sabetian was an intended beneficiary of the Agreement.  Yet IORC's commitment to conform with good industry practice was explicitly stated in the Agreement as an obligation to Iran and NIOC, as were the consortium members' guarantees.

Soraya also argues defendants' control over the Abadan refinery is demonstrated by the recital language in the Agreement that the consortium members "are in a position and

---

[15]    Although the Chevron and Exxon defendants dispute that good oil industry practice included ensuring refinery workers were not exposed to unsafe levels of asbestos, we assume without deciding that good oil industry practice included such an obligation.

are willing to supply . . . capital, management and skills" and that the consortium members "should undertake the operation and management of certain . . . oil properties . . . including the Abadan refinery, as hereinafter set forth."  Although the recital language refers to the consortium members undertaking operation and control of the Abadan refinery, that language is qualified by the words "as hereinafter set forth."  As discussed, articles 4 and 5 of the Agreement provided that "no person other than the Operating Companies, shall at any time . . . carry out . . . any of the functions" of exploration, production, and refining, subject to the supervision of NIOC and Iran.  The Agreement divided authority over refinery operations between the Operating Companies (IORC and IOEPC) and NIOC, and it vested NIOC and Iran with authority to supervise the operating companies' performance.  Contrary to Soraya's position, the Agreement does not grant the consortium members supervisorial or managerial control over IORC, IOEPC, NIOC, or the Abadan refinery.  Thus, the recital language referring to the willingness of the consortium members to provide their management abilities and their agreement to undertake the operation and management of the oil facilities was by its own terms limited by the specific provisions of the Agreement that vested responsibility for operation and control in the Operating Companies and NIOC.  (See *Hunt v. United Bank & Trust Co., supra*, 210 Cal. at p. 115.)  Moreover, the parties' recitals are antecedent to the Agreement's proclamation, "NOW THEREFORE, it is hereby agreed by and between [Iran and NIOC] and [the consortium members]," indicating the parties did not intend the recitals to have a binding effect.

24

Finally, the other evidence submitted by the Sabetians also did not create a triable issue of fact that the consortium members had control over operations at the Abadan refinery. The testimony of Larson, testifying as Exxon Mobil Corporation's person most qualified, that "there may have been some" Exxon or Mobil employees in high level management positions at the Abadan refinery is consistent with defendants' evidence that employees of consortium members who worked at the Abadan refinery were loaned to the refinery and under the control of and paid by IORC. For example, Soler, the senior subsidiary governance liaison for Chevron Corporation, declared that consortium members sometimes provided "skilled personnel" to the Abadan refinery in response to requests from the Operating Companies, but these workers were then "formally employed" by the Operating Companies, not their former consortium member employer. Similarly, Conlin, who in 1958 was an assistant chief design engineer employed by Texaco, Inc., testified that from 1958 to 1963 he was seconded to work at the Abadan refinery, at which time he was employed and paid by IORC and took direction from IORC, not Texaco, Inc., or other American oil companies. Further, Larson testified he was not aware of Exxon or Mobil "exercis[ing] any direct control over anybody" working at the Abadan refinery. The Sabetians did not submit any evidence showing employees of the consortium members who were seconded to the Abadan refinery as management employees were paid by the consortium members or their work was directed or controlled by the consortium members.[16]

---

[16] Soraya also relies on Agopowicz's testimony in which he agreed that the Exxon defendants' predecessors "believe[d] at the

25

Soraya's reliance on the holding in *Kesner, supra*, 1 Cal.5th 1132 is misplaced. In *Kesner*, the Supreme Court held that employers and premises owners have a duty to protect family members of on-site workers from secondary exposure to asbestos carried home on the bodies and clothing of the workers. (*Id.* at p. 1140.) The *Kessner* court started from the premise that under section 1714, "'the general duty to take ordinary care in the conduct of one's activities' applies to the use of asbestos on an owner's premises or in an employer's manufacturing processes" (*Kessner*, at p. 1144), but it considered the *Rowland* factors to determine "'whether a categorical exception to that general rule should be made' exempting property owners and employers from potential liability to individuals who were exposed to asbestos by way of employees carrying it on their clothes or person." (*Id.* at p. 1145, quoting *Cabral, supra*, 51 Cal.4th at p. 774.) The *Kessner* court concluded it was "entirely foreseeable" that workers would bring asbestos dust home at the end of the day if adequate precautions were not taken, and, therefore, "[t]he foreseeability factors weigh in favor of finding a duty." (*Kesner*, at p. 1149.)

Unlike the defendants in *Kesner*, there is no evidence the Chevron and Exxon defendants operated or controlled the

_____

time of signing [the Agreement] that [they] had an obligation to ensure that the Abadan [r]efinery was operated appropriately." But as discussed, the consortium members' guarantees were to Iran and NIOC and fall short of evidence defendants exercised direct control of day-to-day operations at the refinery. Further, although Agopowicz was designated as the person most qualified for the Exxon defendants, his testimony was not based on personal knowledge of the consortium members' intent in entering into the Agreement, but his reading of the Agreement.

Abadan refinery or the sources of asbestos at the refinery, thereby imposing on them a duty under section 1714 to protect refinery workers like Sabetian from exposure to asbestos. (See *Isaacs v. Huntington Memorial Hospital, supra*, 38 Cal.3d at p. 134.) Sabetian was employed by NIOC on premises operated by NIOC and IORC. This is in contrast to the allegations at issue in *Kesner* that the defendant's predecessors were "engaged in active supervisory control and management of asbestos sources" at the workplace. (*Kesner*, *supra*, 1 Cal.5th at p. 1161.)

3. *Soraya failed to raise a triable issue of fact the Agreement created a special relationship between defendants' predecessors and Sabetian*

Soraya contends the Chevron and Exxon defendants (through their predecessor companies) owed a duty to protect refinery workers like Sabetian from asbestos exposure based on a special relationship between the consortium members and the refinery workers arising from the consortium members' guarantee in the Agreement of the Operating Companies' "due performance" under the Agreement, relying on *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*) and *J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799 (*J'Aire*). Under Soraya's argument, the Chevron and Exxon defendants owed a duty to the refinery workers because injury to refinery workers from asbestos exposure was reasonably foreseeable under the Agreement. Further, Soraya points to the Operating Companies' obligation to conform to "good oil industry practice and sound engineering principles." Defendants respond it was IORC and NIOC that had a special relationship with refinery workers like Sabetian under the Agreement based on their control of the Abadan refinery, not

27

the consortium members, and therefore the Agreement did not create a duty on the part of the consortium members. The Chevron and Exxon defendants have the better argument.[17]

"A duty running from a defendant to a plaintiff may arise from contract, even though the plaintiff and the defendant are not in privity. [Citations.] Under these circumstances, the existence of a duty is not the general rule, but may be found based on public policy considerations." (*Lichtman v. Siemens Industry Inc.* (2017) 16 Cal.App.5th 914, 921 (*Lichtman*) [company responsible for maintaining battery backup system for traffic signals owed duty of care to plaintiffs who were injured in traffic collision during power outage in which traffic signal stopped functioning].) The Supreme Court has recognized negligence claims by third parties against contractors based on a special relationship arising from the contract between the contractor and the owner of the property, applying the six-factor balancing test the Supreme Court articulated in *Biakanja, supra*, 49 Cal.2d 647 to determine whether a notary public who drafted a will for the decedent owed a duty of care to an estate beneficiary who was not in contractual privity with the notary

---

[17] Soraya does not argue, and we do not reach, whether the predecessors to the Chevron and Exxon defendants owed a duty based on a special relationship with Sabetian to protect him from the criminal conduct of third parties. (*Regents, supra,* 4 Cal.5th at p. 619 ["a duty to control may arise if the defendant has a special relationship with the foreseeably dangerous person that entails an ability to control that person's conduct"]; accord, *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235 ["A defendant may owe an affirmative duty to protect another from the conduct of third parties if he or she has a 'special relationship' with the other person."].)

28

public.  (See *J'Aire, supra*, 24 Cal.3d at pp. 802, 804-805 [lessee who operated a restaurant alleged sufficient facts to state a cause of action for negligence to recover lost income from dilatory performance by contractor hired by owner of building to renovate restaurant]; *Stewart v. Cox* (1961) 55 Cal.2d 857, 859 (*Stewart*) [upholding homeowner's judgment for property damage against subcontractor who was not in privity with the homeowner for the negligent application of concrete inside a swimming pool, causing a leak that damaged the pool and house]; see generally *Aas v. Superior Court* (2000) 24 Cal.4th 627, 637-645 (*Aas*) [detailing evolving case law], superseded by statute on other grounds as stated in *Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1079-1080.)

Under the *Biakanja* and *J'Aire* balancing tests, in determining whether a duty of care arises from a contract in favor of a noncontracting party, the Supreme Court considered "[(1)] 'the extent to which the transaction was intended to affect the plaintiff,' [(2)] 'the foreseeability of harm to [him],' [(3)] 'the degree of certainty that the plaintiff suffered injury,' [(4)] 'the closeness of the connection between the defendant's conduct and the injury suffered,' [(5)] 'the moral blame attached to the defendant's conduct,' and [(6)] 'the policy of preventing future harm.'"  (*Southern California Gas Leak Cases, supra*, 7 Cal.5th at p. 401, citing *J'Aire, supra*, 24 Cal.3d at p. 804; accord, *Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 838 (*Goonewardene*);[18] *Aas, supra*, 24 Cal.4th at p. 644; *Stewart,*

---

[18]    In *Goonewardene, supra*, 6 Cal.5th at page 838, the Supreme Court observed additional "policy considerations that may appropriately be considered in determining whether a tort

29

*supra*, 55 Cal.2d at p. 863; see *Biakanja, supra*, 49 Cal.2d at p. 650.)[19]

In *J'Aire*, the Supreme Court concluded as to the first factor that because the purpose of the contract between the property owner and the contractor was to renovate the heating and ventilation systems at the lessee's business premises (a restaurant), the work "could not have been performed without impinging" on the lessee's business, and therefore the contractor's "performance was intended to, and did, directly affect [the plaintiff]." (*J'Aire, supra*, 24 Cal.3d at p. 804.) With respect to the second factor, the *J'Aire* court held "it was clearly foreseeable that any significant delay in completing the construction would adversely affect [the lessee's] business beyond the normal disruption associated with such construction. [The lessee] alleges this fact was repeatedly drawn to [the contractor's] attention."

---

duty of care should be recognized or imposed in the absence of privity of contract" included whether recognition of the duty of care "would (1) impose liability out of proportion to fault, (2) be unnecessary in light of the prospect of private ordering [of a product or service], and (3) would likely have an adverse effect on the availability of [a defendant's] services." Because Soraya has not argued that consideration of these additional factors supports finding a duty of care, we focus on the factors in the *Biakanja* and *J'Aire* balancing tests as briefed by the parties.

[19] The Supreme Court in *Southern California Gas Leak Cases, supra*, 7 Cal.5th at page 401 explained the *J'Aire* and *Biakanja* balancing tests apply a subset of the factors first established in *Rowland, supra*, 69 Cal.2d at page 113 to determine whether a defendant owes a duty of care to the plaintiff. For simplicity, we refer to the "*J'Aire* factors," as the Supreme Court did in *Aas, supra*, 24 Cal.4th at page 646.

(*Id*. at pp. 804-805.)  As to the third and fourth factors, the complaint "[left] no doubt" the lessee suffered harm as a direct result of the contractor's negligence because it was unable to open its restaurant for a month because of delayed construction, and it operated without heat and air conditioning for even longer.  (*Id*. at pp. 802, 805.)  As to the fifth factor, the contractor's "lack of diligence in the present case was particularly blameworthy since it continued after the probability of damage was drawn directly to [its] attention."  (*Id*. at p. 805.)  With respect to the sixth factor, the *J'aire* court reasoned there is a public policy to discourage construction delays, which policy would be advanced by recognizing a duty of care.  (*Ibid*.)  The *J'Aire* court concluded, "[T]his court holds that a contractor owes a duty of care to the tenant of a building undergoing construction work to prosecute that work in a manner which does not cause undue injury to the tenant's business, where such injury is reasonably foreseeable."  (*Id*. at p. 808.)

Contrary to Soraya's argument, the *J'Aire* factors do not support imposition of liability on the Chevron and Exxon defendants by virtue of the consortium members' guarantee in article 3 of the Operating Companies' performance of their obligations under the Agreement.  Most significantly, under the first factor, the Agreement was not intended to affect Sabetian or other refinery workers, but rather, it was intended to accelerate Iranian oil production and exportation to the global market.  Indeed, the obligations of the Operating Companies most relevant to protection of the refinery workers—to conform with good industry practice and prepare plans and programs for industrial and technical training and education—were specifically owed under the Agreement "to Iran and NIOC."

31

Sabetian is unlike the plaintiff in *J'Aire*, a lessee whose restaurant business was interrupted by a contractor's renovations to improve the restaurant, or the plaintiff in *Biakanja*, the sole beneficiary of a will the notary public negligently failed properly to attest. (*J'Aire, supra*, 24 Cal.3d at p. 804; *Biakanja, supra*, 49 Cal.2d at pp. 648, 651.)

Typically, as in *J'Aire* and *Stewart*, the first two *J'Aire* factors operate in tandem—because the underlying contract was intended to affect the plaintiffs, the harm to the plaintiffs as a result of the defendants' negligence was a fortiori foreseeable. (See *J'Aire, supra*, 24 Cal.3d at pp. 804-805 [where defendant's performance was intended directly to affect the lessee, "it was clearly foreseeable that any significant delay in completing the construction would adversely affect [the lessee's] business beyond the normal disruption associated with such construction"]; *Stewart, supra*, 55 Cal.2d at p. 863 [because the concrete work was intended for plaintiffs, the property damage to them "was foreseeable in the event the work was . . . negligently done"]; see also *Chameleon Engineering Corp. v. Air Dynamics, Inc.* (1980) 101 Cal.App.3d 418, 422-423 [general contractor alleged sufficient facts to state negligence claim against supplier of component parts to subcontractor for delay in provision of parts where supplier knew intent of its contract with subcontractor was to provide essential parts general contractor needed, and therefore it was foreseeable a delay in supplying the parts would harm general contractor].) Conversely, where a transaction is not intended to affect the plaintiff, this fact may show the harm to the plaintiff was not reasonably foreseeable. (See, e.g., *Mega RV Corp. v. HWH Corp.* (2014) 225 Cal.App.4th 1318, 1341 [because repair of plaintiff's mobile home by retailer was not

intended to affect manufacturer of component part for mobile home, it was not reasonably foreseeable the component part manufacturer would be sued by plaintiff; therefore, retailer did not owe duty to component part manufacturer]; *Ott v. Alfa-Laval Agri, Inc.* (1995) 31 Cal.App.4th 1439, 1455-1456 [where milking system was not intended to affect plaintiff, defect in system manifesting 15 years later was not reasonably foreseeable].)

As the Supreme Court observed in *Goonewardene, supra*, 6 Cal.5th at page 840, where a plaintiff is not entitled to maintain a breach of contract action based on the third party beneficiary doctrine, "it would clearly be anomalous to impose tort liability, with its increased potential damages [citation], upon [the defendant] based upon its alleged failure to perform its obligations under its contract with plaintiff's employer." Here, Sabetian was not a third party beneficiary of the Agreement because one the three required elements is missing—that the "motivating purpose of the contracting parties was to provide a benefit to the third party." (*Id*. at p. 830.)

The foreseeability of harm to refinery workers as a result of the consortium members' failure to protect refinery workers under the Agreement does not favor Soraya. Although it was foreseeable oil refinery operations could result in asbestos exposure to refinery workers, the role of the consortium members must be viewed in the context of the purpose of the Agreement— to enable Iran to develop its oil resources. To accomplish this goal, the consortium members created IOP and its subsidiaries, IORC and IOEPC, and the Agreement in article 4 vested the power to control day-to-day operations in those companies, not the consortium members. Further, as discussed, article 5 of the Agreement prohibited any entity other than the Operating

Companies (IORC and IOEPC) from carrying out the assigned operational functions under the Agreement. The fact the consortium members committed to ensure the Operating Companies performed their obligations under the Agreement does not mean the consortium members had the power to control the day-to-day activities of the refineries. This is unlike the situation in *J'Aire*, in which the contractor had the ability to control the extent to which the tenant was harmed by the contractor's conduct under the agreement with the property owner. (*J'Aire, supra*, 24 Cal.3d at p. 804.)

As to the third factor, there is a high degree of certainty that Sabetian suffered injury due to his exposure to asbestos at the Abadan refinery.[20] But the fourth factor, the closeness of the connection between consortium members' conduct and Sabetian's injury, is attenuated because IORC and NIOC, not the consortium members, controlled day-to-day refinery operations. Likewise, the fifth factor, the moral blame attached to the consortium members' conduct, is weak. "'Negligence in the execution of contractual duties is generally held to be morally blameworthy conduct.'" (*Lichtman, supra*, 16 Cal.App.5th at p. 925.) But Soraya did not present any evidence of the consortium members' negligence in the execution of their contractual duties or, as noted, that they had control over the operations that caused the harm.

---

[20] On appeal, defendants do not contend Soraya failed to raise a triable issue of fact regarding whether Sabetian's mesothelioma was caused by asbestos exposure at the Abadan refinery. For purposes of our analysis under *J'Aire*, we assume Soraya has raised a triable issue as to causation.

The sixth factor, the policy of preventing future harm, similarly does not favor Soraya.  Because the consortium members were not in a position to control the day-to-day operations of the Abadan refinery, they were not in the best position to prevent future harm at the refinery.  Further, the Agreement acknowledged the consortium members were separate corporate entities from the Operating Companies, including IORC.  We recognize the important public policy to require employers to provide a safe and secure workplace, but there is also a public policy recognizing the benefits of allowing companies to limit their business risks through the creation of a separate corporate entity.  (*Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 512 ["society recognizes the benefits of allowing persons and organizations to limit their business risks through incorporation"]; *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1249 [same].)  Had the Sabetians presented evidence showing the consortium members should have been treated as the alter egos of IOP, which in turn should have been considered the alter ego of IORC, this would have tipped the balance toward Soraya.  But the Sabetians abandoned this legal argument in the trial court.

*Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1197 (*Seo*), relied on by Soraya, does not support a contrary result.  There, a commercial subtenant was injured when he reached his arm through an electronic sliding gate to activate a switch to close the gate.  (*Id.* at p. 1198.)  The Court of Appeal concluded the defendant company that had repaired the gate for the property owner owed no duty of care to the subtenant to warn of design defects unrelated to the repairs performed by the defendant.  (*Id.* at pp. 1198-1199.)  The *Seo* court observed,

however, that an independent contractor may owe a duty to a third party where it negligently performs a repair, fails to make a requested repair, or assumes the owner's duty to inspect and maintain the equipment and negligently fails to perform, leading to injury to the third party. (*Id*. at p. 1206.) Here, Soraya has not presented evidence showing defendants performed repairs, inspections, or maintenance or assumed the responsibility assigned to IORC and NIOC under the Agreement to inspect or maintain the Abadan refinery.[21]

On balance the *J'Aire* factors do not support imposition of liability on the Chevron and Exxon defendants, especially in light of the strength of the first factor—Soraya seeks to impose a duty on the consortium members arising from the Agreement, but the Agreement was never intended to benefit the refinery workers.

D.     *The Trial Court Did Not Abuse Its Discretion in Awarding Discovery Sanctions to the Exxon Defendants*

1.     *Proceedings below*

On July 2, 2018, the 10th day of Sabetian's deposition, the attorney for the Exxon defendants, Jon Kasimov, asked Sabetian, "Do you have any information that Exxon[ ]Mobil Corporation

---

[21]     Soraya also relies on *Harold A. Newman Co. v. Nero* (1973) 31 Cal.App.3d 490, 496 for the proposition "a person who has assumed the contractual duty to perform a service for another cannot escape his contractual obligation to perform the service in a competent manner by delegating performance to another." But under the Agreement, it was IORC and NIOC that assumed the duty to control refinery operations. Soraya has provided no authority for the proposition a party who guarantees the performance of another assumes a duty to prevent harm to third parties caused by performance of the service.

caused you to be exposed to asbestos?" Sabetian's attorney Benno Ashrafi objected and instructed Sabetian not to answer. Ashrafi explained, "That's a contention interrogatory. You can propound an interrogatory and we will respond."

Kasimov continued to ask a series of questions concerning the Exxon defendants and their predecessors, to which Ashrafi instructed Sabetian not to answer, including: "Do you have information that [the Exxon defendants] misrepresented anything to you?"; "Do you have any information that [the Exxon defendants] concealed any information from you?"; "Do you have any knowledge that [the Exxon defendants] acted with a conscious disregard for your safety or with intent to harm you?"; "Do you have any information that [the Exxon defendants] operated Abadan?"; "Have you worked at any refinery, oil field, or other facility that you contend was owned or operated by [the Exxon defendants]?"; "Do you know if [the Exxon defendants] made, sold or supplied any product used at any of your job sites?"; "Do you have any information that [the Exxon defendants] caused you to be exposed to asbestos?"[22] Relying on *Rifkind v. Superior Court* (1994) 22 Cal.App.4th 1255 (*Rifkind*), Ashrafi asserted the questions should "be propounded as . . . contention interrogator[ies]."

At a July 26, 2018 informal discovery conference, the trial court reviewed five of the questions and explained the "questions

_____

[22] Kasimov asked some or all of these questions as to Exxon Mobil Corporation, ExxonMobil Oil Corporation, Exxon Corporation, Mobil Oil Corporation, Humble Oil Refining Company, and companies with the names Esso, Enco, Socony, and Standard Oil. Each time, Ashrafi instructed Sabetian not to answer.

37

cannot refer to legal contentions for this witness." The court continued, "And it's understood that the questions are to call for his personal knowledge and not for his contentions or information that might be possessed by other witnesses or his attorneys. [¶] With that clarified, I've ordered that any objections based on *Rifkind* be matters for the record that I will rule on prior to trial, if necessary; and that the witness is to go ahead and answer the question[s] to the best of [his] ability."

When Sabetian's deposition continued on July 31, 2018, Ashrafi placed several documents in front of Sabetian, including a July 12, 2017 order of the Superior Court of Los Angeles, Judge Steven Kleifield, denying the Exxon defendants' motion for summary judgment in the case *Kordestani v. 3M Company* (Super. Ct. Los Angeles County, 2017, No. BC519273) (*Kordestani* order) and three invoices Ashrafi described as "reflecting [Exxon]'s supply of materials to the Abadan [r]efinery." Kasimov objected, "For you to provide him with information that is outside of the parameters of this case to try to lead him and coach him, I think is highly improper." Kasimov asked Sabetian, "[D]o you know, based upon your personal knowledge, whether [Exxon Mobil] Corporation caused you to be exposed to asbestos?" Ashrafi again objected based on *Rifkind*. He explained, "[Sabetian] has given 14 days of testimony about what he has done in the Abadan [r]efinery. We are not going to call him to testify about the details of the contract. We believe the contract makes [Exxon] responsible for the operation of the Abadan [r]efinery, and as such, any exposure at the Abadan [r]efinery would be . . . caused by [Exxon]." Sabetian then answered, "Well, I think the judge's opinion [in the *Kordestani* order] is my personal opinion." However, after further discussion

38

between counsel, Kasimov asked the question again and Sabetian responded, "Yes. Definitely. Look at me."

Kasimov asked, "Do you know whether [Exxon Mobil] Corporation concealed any information from you?" Ashrafi again objected under *Rifkind*. Sabetian then answered, "No." But after Ashrafi interjected and told Sabetian, "He is asking if [Exxon] ever concealed any information," Sabetian responded, "Concealed, of course." Kasimov inquired, "What information?" Sabetian responded, "Because all of the product, they had asbestos and they never actually declare . . . anything about asbestos and the dangers of asbestos."

Kasimov asked, "Do you have personal knowledge whether [Exxon Mobil] Corporation either acted or failed to act with a conscious disregard for your safety?" Sabetian responded, "Yes." But when asked "What did they . . . ," he stated the *Kordestani* order "shows that [Exxon] had no regard for safety and especially never—they have mention about the danger of asbestos." Kasimov asked Sabetian if he had any knowledge "[i]ndependent of the [j]udge's [o]rder," to which Ashrafi again asserted an objection under *Rifkind*. When Kasimov asked Sabetian for his answer, Sabetian responded, "[T]hat was my exactly the same what I said before." Kasimov claimed Ashrafi had "sandbagged" him by waiting until the last day of Sabetian's deposition, then having Sabetian testify to knowledge "he clearly doesn't have." After a vitriolic exchange between counsel and discussions of possible stipulations, Kasimov suspended the deposition without asking all his questions.

On August 3, 2018 the Exxon defendants filed a motion for terminating, evidence, issue, and monetary sanctions, arguing Ashrafi improperly coached Sabetian by making inappropriate

39

speaking objections and providing Sabetian with documents after the trial court had ordered Sabetian to testify from personal knowledge.  The Exxon defendants filed a declaration by Kasimov, in which he stated that after the July 26, 2018 informal discovery conference he had "spent time re-wording [his] questions" to "make it even clearer that the questions seek Mr. Sabetian's personal knowledge."  The Exxon defendants requested $12,790 in monetary sanctions.

At the August 28, 2018 hearing, the trial court stated, "Reviewing the transcript and knowing the history of this, it's apparent to me that Mr. Sabetian does not have any personal knowledge about the involvement of Exxon or its subsidiaries at the site."  Addressing Ashrafi, the trial court continued, "I think by providing [Sabetian] the type of documents you were providing him, you were encouraging him to make contentions.  And the whole point I think I clarified pretty clearly and actually went on the record to say it, is that we were just looking for his personal knowledge here in this deposition.  [¶]  Providing him these documents and having him argue from them really did obstruct the deposition.  It sought to evade my order."  The court noted Sabetian's deposition responses on July 31, 2018 were "answer[s] [Sabetian] was trained to give" and "his whole testimony, if he had anything, it's completely worthless to [the Exxon defendants]."  The court asked Ashrafi, "Why are you feeding [Sabetian] what is obviously legal contentions to repeat to [the Exxon defendants], which results in useless testimony, going around in circles, and prolonging the deposition until we get to the point that [Sabetian] has no recollection of ever seeing the word Exxon, which is what we all know to be true?"  The court admonished Sabetian's attorneys, "[T]he whole point of my order,

and I couldn't be clearer, was let him answer the question and we will figure [the *Rifkind* issue] out later. . . . [¶] . . . If the question is somehow improper under *Rifkind* . . . it's going to be ruled out."

On September 20, 2018 the trial court granted in part the Exxon defendants' motion for sanctions. The court ordered, "Plaintiff is deemed to have no personal knowledge as to the questions he was instructed not to answer during the July 2, 2018 session of his deposition regarding [the Exxon defendants] and their related companies." The court further ordered monetary sanctions against Sabetian and his attorney in the amount of $2,500.

2.     *Standard of review and applicable law*

Code of Civil Procedure section 2023.030 authorizes a trial court to impose a range of penalties against "any party engaging in the misuse of the discovery process," including monetary and evidence sanctions (*id.*, subds. (a), (c)). (Accord, *Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, 390; *Kayne v. The Grande Holdings Limited* (2011) 198 Cal.App.4th 1470, 1475.)

Code of Civil Procedure section 2023.010 provides that misuses of the discovery process include "[f]ailing to respond or to submit to an authorized method of discovery" (*id.*, subd. (d)), "[m]aking, without substantial justification, an unmeritorious objection to discovery" (*id.*, subd. (e)), "[m]aking an evasive response to discovery" (*id.*, subd. (f)), and "[d]isobeying a court order to provide discovery" (*id.*, subd. (g)).

We review the trial court's imposition of discovery sanctions for an abuse of discretion. (*Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 765; accord, *Britts v.*

41

*Superior Court* (2006) 145 Cal.App.4th 1112, 1123 [abuse of discretion standard of review applies "to review of an order imposing discovery sanctions for discovery misuse" unless "the propriety of a discovery order turns on statutory interpretation"].) "We view the entire record in the light most favorable to the court's ruling, and draw all reasonable inferences in support of it. . . . The trial court's decision will be reversed only 'for manifest abuse exceeding the bounds of reason.'" (*Slesinger*, at p. 765; accord, *Los Defensores, Inc. v. Gomez, supra*, 223 Cal.App.4th at p. 390 ["""The power to impose discovery sanctions is a broad discretion subject to reversal only for arbitrary, capricious, or whimsical action."""].)

In *Rifkind, supra*, 22 Cal.App.4th 1255, the Court of Appeal held it was improper for a party to ask "legal contention questions" at a deposition, which the court defined as "deposition questions that ask a party deponent to state all facts, list all witnesses and identify all documents that support or pertain to a particular contention in that party's pleadings." (*Id.* at p. 1259.) The *Rifkind* court clarified it was not addressing "questions at a deposition asking the person deposed about the basis for, or information about, a factual conclusion or assertion, as distinguished from the basis for a legal conclusion." (*Ibid.*) It reasoned it would be "unfair" to "call upon the deponent to sort out the factual material in the case according to specific legal contentions, and to do this by memory and on the spot." (*Id.* at p. 1262.) The *Rifkind* court explained, "If the deposing party wants to know facts, it can ask for facts; if it wants to know what the adverse party is contending, or how it rationalizes the facts as supporting a contention, it may ask that question in an interrogatory." (*Ibid.*)

42

3. *The trial court did not abuse its discretion in ordering monetary and evidence sanctions*

Soraya contends the trial court abused its discretion in ordering monetary and evidence sanctions based on Ashrafi's conduct in relation to Sabetian's deposition. She argues Kasimov's questions were improper under *Rifkind*, and Sabetian's review of documents to prepare for the deposition was an "attempt[] to answer the improper deposition questions as if they had been properly propounded as contention interrogatories." Soraya asserts, "The trial court, upon determining that the deposition questions were improper under *Rifkind*,[23] should not have permitted Exxon to re-ask the same questions with the limitation that they only need be answered from personal knowledge." The trial court did not abuse its discretion.

At the informal discovery conference, the trial court ordered Sabetian to answer the questions to the best of his ability, and then the court would rule on any *Rifkind* objections at a later date. Kasimov modified the questions he asked at the July 31, 2018 deposition to comply with the court's order that "the questions are to call for [Sabetian's] personal knowledge and not for his contentions or information that might be possessed by other witnesses or his attorneys." For example, Kasimov asked whether Sabetian had personal knowledge "whether [Exxon Mobil] Corporation caused [him] to be exposed to asbestos." Had

---

[23] Soraya inaccurately states "the trial court . . . found that Exxon's questions were improper under *Rifkind*." The trial court did not make a finding as to whether the questions were improper.

43

Sabetian worked under a manager who was employed by Exxon Mobil Corporation, Sabetian could have provided that information. Or if Sabetian received training materials prepared by Exxon Mobil Corporation, he could have provided that information. If he had no personal knowledge, Sabetian could have simply said so. He did not. Ashrafi again objected based on *Rifkind* (which was proper), but then Sabetian answered by stating the court's opinion in the *Kordestani* order was his "personal opinion."

As to the question whether he knew if Exxon Mobil Corporation concealed any information from him, Ashrafi again objected under *Rifkind*, and Sabetian answered, "No." That was proper. But then Ashrafi interjected, "He is asking if [Exxon] ever concealed any information," and Sabetian stated, "Concealed, of course." As to Kasimov's question whether Sabetian had personal knowledge "whether [Exxon Mobil] Corporation either acted or failed to act with a conscious disregard for [Sabetian's] safety," Sabetian failed to state whether he had any personal knowledge, instead responding that the *Kordestani* order "shows that [Exxon] had no regard for safety and especially never—they have mention about the danger of asbestos." This caused Kasimov to suspend the deposition without asking his remaining questions.

Ashrafi defied the trial court's order. Instead of allowing Sabetian to testify as to his personal knowledge to the best of his ability, while preserving his objections under *Rifkind*, Ashrafi provided Sabetian documents to use in response to Kasimov's questions as though they were contention interrogatories. We recognize the questions asked Sabetian to state whether he had personal knowledge of the actions of the Exxon Mobil Corporation

44

defendants and their predecessors, not IORC or NIOC. But to the extent Sabetian believed this was a disguised contention interrogatory seeking Sabetian's legal theory, Ashrafi could have preserved his objection under *Rifkind* but still allowed Sabetian to answer the question by saying he did not have any personal knowledge. Ashrafi could later seek to exclude Sabetian's response from being used at trial. Ashrafi's efforts to have Sabetian instead rely on facts and legal conclusions set forth in the *Kordestani* order, and Sabetian's refusal to respond whether he had any personal information regarding Exxon Mobil's involvement, violated the letter and spirit of the court's order. The court therefore did not abuse its discretion in sanctioning Ashrafi and Sabetian for misuse of the discovery process by "evad[ing]" the trial court's order and "obstruct[ing]" the deposition.[24] (See Code Civ. Proc., § 2023.010, subds. (d)-(g).)

## DISPOSITION

We affirm the judgment. Respondents are entitled to recover their costs on appeal.

---

[24] Although the court deemed Sabetian not to have had personal knowledge as to the questions asked during the July 2, 2018 deposition (not those asked on July 31), this was not an abuse of discretion because Kasimov was planning on asking all the questions he asked at the July 2, 2018 deposition, modified to seek only Sabetian's personal knowledge. Because Kasimov did not have an opportunity to ask those questions on July 31, it was appropriate for the court to deem Sabetian to have no personal knowledge to the questions that were asked on July 2.

45

FEUER, J.

We concur:


PERLUSS, P. J.


DILLON, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SORAYA SABETIAN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>EXXON MOBIL<br>CORPORATION et al.,<br><br>    Defendants and<br>    Respondents. | B297107<br><br>(Los Angeles County<br>Super. Ct. No. BC475956)<br><br>ORDER MODIFYING AND<br>CERTIFYING OPINION<br>FOR PUBLICATION<br><br>NO CHANGE IN<br>APPELLATE JUDGMENT |

THE COURT:*

The opinion in the above-entitled matter filed on October 28, 2020 is modified as follows:

1.    The opinion was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports, and it is so ordered.

2.    On page 3, after the footnote 3 reference, delete "We affirm," and in a new paragraph insert the following:

Contrary to Soraya's contentions, neither the Agreement nor the evidence presented by the Sabetians shows the predecessors to the Chevron and Exxon defendants operated or controlled the Abadan refinery. Nor did the Agreement create a special relationship between the predecessor companies and the refinery workers. A duty to a plaintiff may arise from a contract based on public policy considerations, but here the two most significant factors of the six-factor balancing test articulated by the Supreme Court in *J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799 (*J'Aire*) do not support imposition of liability on the Chevron and Exxon defendants. Most significantly, the Agreement was not intended to affect Sabetian and other refinery workers, but rather, to accelerate Iranian oil production and exportation to the global market. In addition, because the predecessor companies had no ability to control day-to-day operations at the Abadan refinery, it was not foreseeable that the companies' conduct would harm Sabetian and other refinery workers. We affirm.

3. On page 27 replace "*J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799 (*J'Aire*)" with "*J'Aire, supra,* 24 Cal.3d 799."

4. On page 33, in the first full paragraph, insert "of" between "because one" and "the three required elements."

There is no change in the appellate judgment.

---

\* PERLUSS, P. J.    FEUER, J.    DILLON, J.\*\*

\*\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.